**COMMISSIONER OF INTERNAL REV-
ENUE, Petitioner,**

v.

**Louis H. MOONEYHAN, Respondent.**

**No. 18192.**

United States Court of Appeals
Sixth Circuit.

Dec. 5, 1968.

Louis M. Kauder, Dept. of Justice, Washington, D. C., for petitioner; Mitch-

ell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Joseph Kovner, Stephen H. Paley, Attys., Dept. of Justice, Washington, D. C., on brief.

Lowe Watkins, Nashville, Tenn., for respondent.

Before WEICK, Chief Judge, and CELEBREZZE and PECK, Circuit Judges.

CELEBREZZE, Circuit Judge.

This is a petition for review of a Tax Court judgment rendered in favor of Respondent Mooneyhan, hereinafter Respondent. The main question concerns Section 911(a) (2) of the 1954 Internal Revenue Code as it applies to payments Respondent received while working overseas.

In 1956, Iran borrowed funds to begin a comprehensive program of highway maintenance and construction. Lacking the pertinent resources, men, machines, and expertise in particular, Iran entered into a letter agreement on December 18, 1956, with the United States which provided generally that in return for money furnished by Iran, the United States would put its experience and personnel at that Country's disposal to help carry out the program's objectives.

In September of 1959, Respondent, a United States citizen living in Nashville, Tennessee, accepted an "indefinite appointment" as an equipment specialist in the Iran division of the Bureau of Public Roads, Department of Commerce, hereinafter Bureau, the United States agency charged with the administration of the Iran program. Respondent had performed similar work in Ethiopia for the Bureau for several years prior to this appointment. Although he agreed to stay in Iran for at least two years, Respondent could have chosen to remain longer. As it was, he remained for successive two-year periods, interrupted by a nine-month period in the United States.

To obtain the necessary funds for its program, Iran entered into credit agreements with the Export-Import Bank and the International Bank for Reconstruction and Development, located in Washington, D.C. Article XVII of the credit agreement between the Export-Import Bank (Eximbank) and Iran provided:

"Prior to and as a condition of the first advance under the credit, Iran shall make arrangements satisfactory to Eximbank under which the Bureau of Public Roads will provide the services of United States Engineers and technicians to assist in developing and carrying out the program of highway maintenance and training referred to herein and, at the request and with the approval of Iran, will select and purchase highway maintenance equipment, spare parts, and laboratory and shop equipment appropriate thereto and cause the same to be transported and insured to Iran."

Iran issued checks on drawing accounts established with the bank credits, which were deposited as a trust fund account in the United States Treasury under the designation, "Technical Assistance U.S. Dollars Advanced From Foreign Governments, Bureau of Public Roads." This "Working Fund" was established for the following purposes: to pay or reimburse to the United States, either by direct charges against the Fund or through reimbursements therefrom (1) the compensation of all Bureau personnel assigned to Iran and (2) the cost of transporting them, their dependents and household goods both to and from Iran. Iran paid a fee to the Bureau to cover its cost of administering the Fund which was recovered by the Bureau through a one percent charge against the total amount paid out of the Fund. Certain local expenses, such as those for office rental, personnel and transportation, were to be paid directly by Iran.

The letter agreement further provided that Bureau personnel assigned to Iran were to be under the exclusive supervision of a Bureau employee, a Division Engineer, who would write efficiency reports required by Civil Service regulations that apply to United States employees. Such reports are used to determine whether an employee should be pro-

moted. The decision whether to hire an employee for the Iran program or to retain him in it also rested with the Bureau.[1]

Respondent's activities when in Iran were to be controlled by his immediate employer, the Bureau; however his and the Bureau's presence there were contingent upon Iran meeting its obligation to supply dollars for the Working Fund.

Section 911(a) (2) of the Code allows a United States citizen to exclude from gross income "amounts received from sources without the United States." This language is followed by the parenthetical clause, "except amounts paid by the United States or any agency thereof." The exclusion is available when the individual has met certain residence requirements which Respondent did.[2]

Respondent contends that he was paid by Iran, a source admittedly outside the United States, because, when viewed functionally the arrangement delegated to the United States the role of a mere paymaster on behalf of Iran. Petitioner, on the other hand, urges that we ignore the arrangement made by the parties for disbursing the funds and look to the legislative history of Section 911(a) (2) which shows a clear congressional intent to deny the exclusion to virtually all United States employees, including Respondent, because they are such.

The issue presented here is not new, having been passed on by the Courts of Appeals for the Fifth and District of Columbia Circuits, and the Court of Claims. These Courts held that the exclusion was never meant to reach the payments in question.[3] But the United States District Court for the Eastern District of Tennessee and the Tax Court have held to the contrary.[4]

The legislative history of Section 911 demonstrates that the exclusion was intended to spur Americans to work abroad by placing them on an equal footing with their foreign competitors by leaving them subject only to the income taxes levied in the country where they are employed. See Krichbaum v. United States, 138 F.Supp. 515 (E.D.Tenn.1956) where Judge Taylor details the history of this Section.

Attempts were then made in Congress to eliminate the exclusion. Certain Americans, specifically United States employees stationed abroad and paid by the United States Government were receiving a double tax benefit, namely, exemption from all income tax. The exclusion from United States taxes permitted them to escape some of their burden while the traditional reluctance of one sovereign to

1. Respondent was entitled to certain benefits provided by statute to United States employees, including group life insurance, pay increases, annual and sick leave, and unemployment compensation. He did not, however, participate in the United States employees' retirement program or the Federal Employees' Health Insurance program.

2. "Section 911. Earned income from sources without the United States. (a) General Rule.—The following items shall not be included in gross income and shall be exempt from taxation under this subtitle: * * * (2) Presence in foreign country for 17 months.—In the case of an individual citizen of the United States, who during any period of 18 consecutive months is present in a foreign country or countries during at least 510 full days in such period, amounts received from sources without the United States (except amounts paid by the United States or an agency thereof) if such amounts constitute earned income * * * attributable to such period."

3. United States v. Johnson, 386 F.2d 824 (5th Cir. 1967); Commissioner of Internal Revenue v. Wolfe, 124 U.S.App. D.C. 45, 361 F.2d 62 (1966) (Judge Fahy, dissenting), cert. denied, 385 U.S. 838, 87 S.Ct. 86, 17 L.Ed.2d 72; Johnson v. United States, 390 F. 2d 715, 182 Ct.Cl. 593 (1968).

4. Krichbaum v. United States, 138 F.Supp. 515 (E.D.Tenn.1956) (opinion of Judge Taylor). In the instant case, the Tax Court, three judges dissenting, adhered to its decision in Wolfe v. Commissioner, 43 T.C. 572 (1965), which had been reversed by the District of Columbia Circuit in Commissioner of Internal Revenue v. Wolfe, supra.

tax another freed these employees from the rest.[5]

The exclusion was not eliminated; but Congress did add the parenthetical phrase "except amounts paid by the United States or any agency thereof" found in the present Section 911(a) (2) to put an end to the double benefit received by individuals who were paid by the United States or its agency while working abroad.

We now focus on the language of the statute to determine whether, given the congressional purpose behind the exclusion and its exception, Iran or the United States or its agency, the Bureau of Public Roads, paid Respondent's salary.

The Tax Court, relying principally on the reasoning of the Ninth Circuit in Erlandson v. Commissioner of Internal Revenue, 277 F.2d 70 (1960), held that Iran paid Respondent's salary. 47 T.C. 693. Although we agree with the result in Erlandson, we believe that the Tax Court reached the wrong conclusion.

In Erlandson, the taxpayer worked aboard a ship owned by the United States and operated by its agent, a private corporation. The United States deposited funds with its agent out of which Erlandson was paid. The source of these funds was the United States and the Ninth Circuit had to decide who paid them within the meaning of Code Section 911(a) (2). In deciding that Erlandson's salary fell within the exception, the Court used the following yardstick: "If Erlandson was an employee of the United States, the conclusion necessarily follows that his wages were paid by the United States or an agency thereof." The Court determined that Erlandson was an employee of the United States because he worked for that country through its corporate agent, so that: "[the corporate agent] was but a conduit for the payment of wages by the United States to taxpayer."

We agree with this result since Erlandson was working for the United States and being paid with American money. Under the facts of the Erlandson case, the Court properly concluded that when United States employees are paid with United States funds while working abroad, they are not entitled to the Section 911(a) (2) exclusion. Even though the United States was not the source of the funds in the case before us, we believe, nevertheless, that when Congress added the exception it meant to deny the exclusion to all United States employees working overseas no matter who provides the funds for their salaries.

United States employees do not become while working overseas employees of foreign countries competing as such with other employees of those countries for identical wages; nor do they travel abroad with that purpose in mind. To be entitled to the exclusion, there must be a direct relationship between the individual claiming it and his foreign employer; the absence of such a relationship defeats the claim. As we read its legislative history, the exception to the exclusion logically denies to employees of the United States a tax benefit that was enacted by Congress to help American citizens become foreign employees.

This leads to what we believe to be the proper construction of the Section 911(a) (2) exclusion, giving full effect to the congressional purpose behind it; whenever an employee of the United States receives his wages from his employer—whether this be "the United States [itself] or an agency thereof"—the exclusion and the exception to it are to be read together so that the source of the funds becomes immaterial to the question of who paid them.

In the matter before us, Respondent's employment contract was entered into with an agency of the United States Gov-

---

5. The letter agreement confirmed the usual practice: United States employees assigned to the Iran division were exempted from all Iranian income taxes, duties, fees and customs charges.

ernment, the Bureau of Public Roads of the Department of Commerce, which had exclusive control over how his work was to be done, rate of compensation, tenure of employment, and promotions. The Bureau paid his salary biweekly with United States Treasury checks drawn on the dollars in the Working Fund and if it had defaulted in paying his salary, Respondent would have been compelled to face the Bureau, not Iran, to recover it. To Iran, the Bureau was no less than an independent contractor which agreed on behalf of the United States to put American personnel and experience at that Country's disposal in exchange for the dollars in the Working Fund.

"We think the wording of the statute, the ordinary meaning of the words used, and the legislative history, all support the view that basically salaries of U.S. Government employees paid by the U.S. Government are not within the exemption. We see no basis for inserting a gloss that would make the tax exemption applicable where the Government receives reimbursement * * * from another source having no direct relationship to employee-taxpayer. No difference in legislative intention should be ascribed to the fact that the reimbursement is secured by an advance deposit (here made with funds in turn advanced by the U.S. Government)." Commissioner of Internal Revenue v. Wolfe, 124 U.S.App. D.C. 45, 361 F.2d 62, 67 (1966).

■ We hold that although Iran was the source of the funds, as an employee of the United States, Respondent was "paid by * * * an agency thereof," the Bureau of Public Roads, and cannot avail himself of the exclusion provided by Section 911(a) (2) of the Code.

6. Section 162. Trade or Business Expenses. (a) In General.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—
* * *

We now consider additional arguments Respondent raised which were not reached by the Tax Court.

■ He contends that Section 162 (a) (2) [6] of the Code allows him to deduct amounts he spent for meals while working in Iran. Under this Section, Respondent must show that the cost of his meals was a traveling expense incurred "while away from home in the pursuit of [his] trade or business."

■ By providing this deduction, Congress intended to help the taxpayer whose employment demands that he travel. Harvey v. Commissioner of Internal Revenue, 283 F.2d 491 (9th Cir. 1960). This taxpayer normally maintains two homes—his business residence and his usual place of abode. If he travels away for short periods of time, Congress recognized that it is not reasonable to expect him to carry his home with him; as a result, he may deduct his traveling expenses, including those incurred for meals and lodging. On the other hand, if his or his employer's business requires that he remain at another location for longer periods of time he will, under the scheme of our tax law, be expected to take his home with him. Expenses for meals and lodging here are not deductible since they are not incurred "while away from home." See Harvey v. Commissioner of Internal Revenue, 283 F.2d 491 (9th Cir. 1960); Wright v. Hartsell, 305 F.2d 221 (9th Cir. 1962).

■ The Courts, however, have had some difficulty with the phrase "while away from home" since Congress never defined it. The Commissioner and the Courts generally agree that if a taxpayer is away only "temporarily" on business he is considered to be "away from home" within the meaning of the statute and may deduct his expenses. See

(2) traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; * * *."

e. g., Burns v. Gray, 287 F.2d 698 (6th Cir. 1961). But if the taxpayer is away "permanently", a term that presents no real problem, or "indefinitely", a term that does since it begs definition, his tax home shifts to his principal place of employment and he may not deduct his expenses. England v. United States, 345 F.2d 414 (7th Cir. 1965); Cockrell v. Commissioner of Internal Revenue, 321 F.2d 504 (8th Cir. 1963). This concept of tax home has received the tacit approval of the Supreme Court. Commissioner of Internal Revenue v. Stidger, 386 U.S. 287, 87 S.Ct. 1065, 18 L.Ed.2d 53 (1967); United States v. Correll, 389 U.S. 299, 88 S.Ct. 445, 19 L.Ed.2d 537 (1967).

 Respondent accepted his appointment with the Bureau knowing that he would immediately go to Iran and remain there for a minimum of two years or longer, if he desired. His principal post of duty was not Nashville, Tennessee, but Iran. The demands of his employment did not force him to travel from place to place to earn a living; his employer simply asked that he go to Iran and remain there for as long as he liked.[7] Respondent did not travel away from home within the meaning of Code Section 162(a) (2) and he cannot deduct the cost of his meals.

Finally, Respondent asserts that the Commissioner should be estopped from taxing the income he received while employed in Iran because Respondent received tax refunds on wages earned during the years he worked in Ethiopia. This he contends gave him reason to expect the same treatment in later years. The fact that he could save money was, according to Respondent, one of the inducements that led him all the way to Iran.

Respondent's argument is, as we understand it, that the Commissioner should be estopped from collecting taxes not barred by the statute of limitations if he revises his opinion about what the law is. The doctrine of equitable estoppel, however, cannot prevent the Commission-

er from correcting a mistake of law no matter where Respondent was led. Automobile Club v. Commissioner of Internal Revenue, 353 U.S. 180, 77 S.Ct. 707, 1 L. Ed.2d 746 (1957); cf. Schuster v. Commissioner of Internal Revenue, 312 F.2d 311 (9th Cir. 1962).

We find no merit in Respondent's inchoate assertions that the Commissioner could not assess a deficiency for the year 1960 because he had previously refunded to Respondent all taxes withheld for that year, and that Respondent is entitled to a partial exclusion under Code Section 912(1).

Reversed.

---

7. Respondent could have taken his wife with him at Iran's expense.