**George Y. ERLANDSON, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 16458.**

United States Court of Appeals Ninth Circuit.

March 17, 1960.

Ralf H. Erlandson, Roger Rook, Erlandson & Rook, Milwaukie, Or., for petitioners.

Charles K. Rice, Asst. Atty. Gen., Hart H. Spiegel, Lee A. Jackson, Harry Baum, Carter Bledsoe, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before HAMLEY, JERTBERG and KOELSCH, Circuit Judges.

HAMLEY, Circuit Judge.

This is a proceeding by a taxpayer to review a decision of the Tax Court redetermining an asserted income tax deficiency.

George Y. Erlandson failed to report for income tax purposes $10,299.97 received by him in 1954 as wages while serving as second officer on the S.S. Jumper Hitch. This sum was omitted from the report on the ground that it constituted income not paid by the United States or an agency thereof earned while Erlandson was in a foreign country. Section 911(a) (2) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 911 (a) (2) provides for the exclusion of

such an item from gross income and its exemption from taxation.[1]

Disallowing this omission from gross income, the Commissioner of Internal Revenue gave Erlandson notice of a $1,-960.30 deficiency in his income tax for 1954. Erlandson petitioned the Tax Court for a redetermination. Holding that the wages in question were paid by the United States or an agency thereof and were therefore not excludable under section 911(a) (2), the Tax Court redetermined the tax deficiency to be the same as originally determined by the Commissioner. In reaching this decision the Tax Court placed prime reliance upon its own decision in Robert W. Teskey, 30 T.C. 456, involving substantially similar facts.

The only question presented on this review is whether the wages received by Erlandson in 1954 while serving as second officer of the Jumper Hitch were paid by the United States (or an agency thereof), or by Pacific Far East Lines, Inc.

Through and by the Director, National Shipping Authority of the Maritime Administration, Department of Commerce, the United States entered into a general agency agreement with Pacific Far East Lines, Inc., for the operation of the ship. Under this contract the company was appointed as the government's agent "and not as an independent contractor," to manage and conduct the business of vessels assigned to it by the United States. The company agreed to manage and conduct the business for the United States in accordance with such directions, orders, or regulations, not inconsistent with the contract, as the United States might prescribe.

The general agency agreement in effect placed upon the company the duties of a ship's husband. By this is meant one who has been engaged to take care of the shoreside business of the ship and who has no part in the actual management or navigation of the vessel.[2] Article 5 of the general agency contract relates to disbursements, and the material portion thereof, as later amended, is quoted in the margin.[3] The Jumper Hitch, owned by the United States, was assigned to Pacific Far East Lines, Inc.,

1. Section 911(a) (2) reads in part as follows:

   "(a) General rule.—The following items shall not be included in gross income and shall be exempt from taxation under this sub-title:

   * * * * *

   "(2) Presence in foreign country for 17 months.—In the case of an individual citizen of the United States, who during any period of 18 consecutive months is present in a foreign country or countries during at least 510 full days in such period, amounts received from sources without the United States (except amounts paid by the United States or an agency thereof) if such amounts constitute earned income (as defined in subsection (b)) attributable to such period * * *."

2. The Supreme Court similarly characterized an almost identical general agency agreement involved and quoted in part in Cosmopolitan Shipping Co. v. McAllister, 337 U.S. 783, 796, 69 S.Ct. 1317, 93 L. Ed. 1692.

3. "Article 5. Disbursements. * * * The United States shall also advance funds to the General Agent to provide for, and the General Agent shall receive credit for, all crew expenditures accruing during the term hereof in connection with the vessels assigned hereunder, including, without limitation, expenditures on account of wages, extra compensation, overtime, bonuses, penalties, subsistence, repatriation, internment, travel, loss of personal effects, maintenance and cure, vacation allowances, damages or compensation for death or personal injury or illness, insurance premiums, Social Security taxes, state unemployment insurance taxes and contributions made by the General Agent to a pension or welfare fund with respect to the period of this Agreement and in accordance with a pension or welfare plan in effect on the effective date of this Agreement or which, pursuant to collective bargaining agreements, may become effective during the period of this Agreement with respect to officers and members of the crew of said vessels who are or may become entitled to benefits under such plan, or any other payment required by law."

for operation under the foregoing agreement.

In January 1952 Erlandson signed shipping articles at Portland, Oregon, to serve as second officer aboard this vessel. The shipping articles are in form an agreement between the master of the Jumper Hitch and the seamen on that ship. During 1954 the vessel was operated in foreign waters for a sufficient period to entitle Erlandson to the benefits of section 911(a) (2), providing his wages were not paid by the United States or an agency thereof.

The United States provided the company with funds for the wage payments due the officers and crew of the Jumper Hitch. These funds were paid from the Civil Operations Revolving Fund created by Congress in 1951. Third Supplemental Appropriation Act, 1951, ch. 121, 65 Stat. 52, 59, 46 U.S.C.A. § 1241a. The company deposited the funds as received in a bank account under it own name. No provision was made for a trust account, but it is not contended that these monies were commingled with the other funds of the company. The checks given to Erlandson for his services were drawn upon this bank account and were signed by the company as drawer. The company's compensation for the operation of the vessel was not derived from the funds so advanced, but was separately paid on a monthly basis.

The company received credit for all officer and crew expenses, including wages, but this credit could be denied upon a finding of wilful contravention of existing instructions. The terms and conditions of Erlandson's employment were determined in accordance with a collective bargaining agreement between Pacific Far East and Master, Mates, and Pilots Local 90.

If Erlandson was an employee of the United States, the conclusion necessarily follows that his wages were paid by the United States or an agency thereof.

In Cosmopolitan Shipping Co. v. McAllister, supra, involving the liability of a steamship operator under the Jones Act, 46 U.S.C.A. § 688, it was held that a seaman employed on a ship being operated under an almost identical general agency contract was an employee of the United States. The only substantial factual difference between that case and this is that there, but not here, the shipping articles carried the heading, "You Are Being Employed By the United States." [337 U.S. 783, 69 S.Ct. 1319.]

The absence of such a heading on the shipping articles in our case does not seem significant in view of the similarity in the actual terms of the general agency contract. Of more significance is a recital in the Third Supplemental Appropriation Act, 1951, referred to above, establishing the "Vessel Operations Revolving Fund." This recital refers to "seamen employed through general agents as employees of the United States, who may be employed in accordance with customary commercial practices in the maritime industry."

But while Cosmopolitan provides precedent for a determination that Erlandson was an employee of the United States, the Commissioner was not required to establish this in order to sustain his deficiency determination. Amounts paid by the United States or an agency thereof are excepted from the benefits of section 911(a) (2) whether or not the recipient is an employee of the United States. In this respect we agree with the Tax Court decision in Robert W. Teskey, 30 T.C. 456, relied upon by that court in its decision here under review.[4]

Whatever relationship may have existed between Erlandson and the United States, his wages were paid by the latter's general agent from funds transmit-

---

4. Teskey in turn relied upon Leif J. Sverdrup, 14 T.C. 859, in which the sum of $36,279.30, received by the taxpayer as a member of a contracting firm, was held not exempt under section 116(a) of the 1939 code, 26 U.S.C.A. § 116(a), predecessor of section 911(a) (2) of the 1954 code, even though the taxpayer was not an employee of the United States.

ted to the agent for that purpose. Pacific Far East was but a conduit for the payment of such wages by the United States to the taxpayer. Speculation as to where Erlandson could have looked for relief if the payments had not been made is not helpful. The question is who paid the wages, not who would be liable if they were not paid.

Affirmed.